JS-6

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | James B. Zagel | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 5377 | **DATE** | 2/8/2001 |
| **CASE TITLE** | TOYOTA MOTOR SALES vs. PROFILE COCKTAIL LOUNGE, ET AL | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)   ☐ General Rule 21   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]   Motion (12-1) for summary judgment is granted.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | | Document Number |
|---|---|---|---|---|---|
| | No notices required. | | | number of notices | |
| | Notices mailed by judge's staff. | | | FEB 13 2001 | |
| | Notified counsel by telephone. | | | date docketed | |
| ✓ | Docketing to mail notices. | | | mw docketing deputy initials | 20 |
| ✓ | Mail AO 450 form. | | FOR DOCKETING | | |
| | Copy to judge/magistrate judge. | | FEB 12 PM 5:33 | | |
| DW | courtroom deputy's initials | | Date/time received in central Clerk's Office | date mailed notice mailing deputy initials | |

TOYOTA MOTOR SALES, U.S.A., INC.,

Plaintiff,

v.

PROFILE COCKTAIL LOUNGE, INC., (Illinois corporation) doing business as LEXXUS CLUB, GONZALO RODRIGUEZ (Illinois resident), and GLORIA RODRIGUEZ (Illinois resident),

Defendants.

No. 99 C 5377
Judge James B. Zagel

## MEMORANDUM OPINION AND ORDER

This case involves a trademark dispute over the name of a bar which purportedly sounds too much like the name of a car. Plaintiff Toyota Motor Sales U.S.A., Inc. ("Toyota") is the exclusive importer and distributor of Lexus automobiles throughout the United States. It owns the "LEXUS" trademark. Plaintiff first began selling Lexus automobiles in Chicago in 1989 and now maintains a network of eight Lexus dealers in the area.

Defendant, Profile Cocktail Lounge, Inc., is an Illinois corporation owned by husband and wife, Gonzolo and Gloria Rodriguez. Through Profile, Inc., defendants operate Lexxns Club, a small bar and nightclub located on Chicago's northwest side.

Toyota, believing that "Lexxns" sounded too much like "Lexus," asked defendants to change the name of their club. When defendants refused, Toyota sued them, asserting the following claims in its complaint: (1) trademark infringement under 15 U.S.C. § 1114, the Federal Trademark Act and Illinois common law; (2) trademark dilution under 15 U.S.C. § 1125(c) the Trademark Dilution Act and the Illinois Anti-Dilution Act, 765 ILCS 1035/15; (3)

trade name infringement at common law; and (4) unfair competition under 15 U.S.C. § 1125(a)(1), the Federal Trademark Act and at common law. Toyota has not sued for damages; instead it seeks to enjoin defendants from using any trade name which too closely resembles the word "Lexus."

I.  **FACTS**

Defendants Gloria and Gonzalo Rodriguez opened the Lexxns Club at 5447 N. Lincoln Avenue in December 1997. Defendants owned the Dynasty Club, which had also been located on Lincoln Avenue before it was destroyed by fire in 1995. Prior to the fire, the Dynasty Club had a reputation with local police as a source of trouble. Gloria Rodriguez considered that the renovated club should have a new name.

Mr. and Mrs. Rodriguez derived inspiration for the name of their new club from a club called "Darios" which they visited while on vacation in Mexico. The facade at Darios featured the letters "D-A-R-I-O-S" in large capital letters with the "O" serving as the doorway. Defendants liked this idea. They chose the name "Lexxns Club" and commissioned a $15,000 cement facade featuring the word "LEXXnS" with the "n" serving as the entrance to the club.

In deposition, plaintiff's counsel quizzed Gloria Rodriguez about her choice of the name "Lexxns." She stated:

A: [Nexxus] is a shampoo. Lexus was a car, it was taken by Toyota. Nexxus was taken by shampoo company, and we start talking about it. I like the idea of the Xs, we needed an entrance, we switch around.
Q: You like the double X?
A: It's pretty, it's beautiful, and it rolls in Spanish Rs.

The word "Lexxns" also appealed to Mrs. Rodriguez because it connoted something "tasty, pretty, fancy, nice" and "something that is pretty expensive."

Defendants' renovated club sells alcoholic beverages and plays salsa and other dance music. Its clientele are predominately Spanish-speaking residents of Chicago's northwest side.

Defendants do almost no advertising. They have occasionally advertised in *El Colombiano*, a free newsletter for members of the local Colombian-American community. Gloria Rodriguez drives a truck on which the word "Lexxns" is painted on the back right fender. Defendants also send holiday postcards to their patrons and occasionally give away promotional t-shirts at club events.

The Lexxns Club had been in operation for about a year when defendants received a "cease and desist" letter from Toyota's counsel. The letter accused defendants of infringing upon the Lexus mark through use of the term "Lexxus Club." Toyota apparently assumed that defendants identified their club as "Lexxus," with the letter "U" in an upside down form. Toyota informed defendants that the club was identified as "Lexxus Club" in two Ameritech telephone directories and registered as "Lexxus Club" with the Illinois Secretary of State.

Defendants now admit that their former attorney registered the nightclub incorrectly as "Lexxus Club." They told Toyota that it did not know about the incorrect telephone listings, but that it would make immediate efforts to rectify them. Defendants have produced copies of the corrected registration, and the parties agree that the club is now registered as "Lexxns" in the Ameritech directory and with the Illinois Secretary of State.

Defendants were unwilling, however, to submit to Toyota's request that it discontinue use of the name "Lexxns." Defendants admit that they were aware of Toyota's mark when they

3

chose the name, but insist that there is no infringement or dilution. They contend that the semantic differences between "Lexxns" and "Lexus" coupled with the vastly different products offered by each party make it extremely unlikely that consumers would consider Toyota as associated with the nightclub, or that the word "Lexxns" would dilute the distinctiveness of plaintiff's mark.

## II. TRADEMARK INFRINGEMENT

To establish a prima facie case of trademark infringement, Toyota must show that it owns valid registered trademarks and that defendants' use of these trademarks is "likely to cause confusion, or to cause mistake, or to deceive . . ." 15 U.S.C. § 1114(1)(a).[1] Consumer confusion need not be restricted to confusion over the source of the goods. I must also consider whether a consumer would likely believe that Lexxns Club is "in some way related to, or connected or affiliated with, or sponsored by" plaintiff Toyota. *Nike, Inc. v. "Just Did It" Enterprises*, 6 F.3d 1225, 1228 (7th Cir. 1993).

The parties agree that plaintiffs have rights in the Lexus marks. Consequently, I turn to the "likelihood of confusion" analysis to determine whether there are issues of material fact which would preclude summary judgment. When assessing likelihood of consumer confusion, this Circuit looks to seven factors: (1) strength of complainant's mark; (2) similarity of the marks in appearance and suggestion (3) similarity of the products; (4) area and manner of concurrent use; (5) degree of care likely to be exercised by consumers; (6) actual confusion; and (7) intent of defendant to "palm off his product as that of another." *AHP Subsidiary Holding Co. v. Stuart*

---

[1] We measure federal trademark infringement, 15 U.S.C. § 1114, and federal unfair competition, 15 U.S.C. § 1125(a)(1)(A), by identical standards.

4

*Hale Co.*, 1 F.3d 611, 615 (7th Cir. 1993). The list of factors is not exclusive, nor does any one factor end the inquiry. See *McGraw-Edison Co. v. Walt Disney Productions*, 787 F.2d 1163, 1167-68 (7th Cir. 1986). The weight and totality of the most important factors in each case will ultimately be determinative of the likelihood of confusion, not whether the majority of the factors tilt the scale in favor of one side or the other. See *Schwinn Bicycle Co. v. Ross Bicycles, Inc.*, 870 F.2d 1176, 1187 (7th Cir.1989).

### *(1) strong mark*

The word "Lexus" has no meaning in the English language, save as plaintiff's trademark. As such, it is an arbitrary, fanciful mark. The Lexus brand of automobiles is heavily advertised and fairly well-known. Defendants concede as much. A mark with extensive public recognition is accorded greater legal weight than an obscure mark. See *Recot, Inc. v. M.C. Becton*, 214 F.3d 1322, 1327 (Fed. Cir. 2000). This factor weighs in favor of Toyota.

### *(2) similarity of marks*

Next I must consider the similarity of the marks, both in terms of visual appearance and pronunciation. Both words begin with an "l," have an "x" in the middle and end with an "s." The first syllable is identical in both words. The prefix "lex" is not, however, uncommon (as in lex, lexical, lexicon, Lex Luther, Lexington, KY).

Moreover, the second syllables "ns" and "us" appear and sound so different that they would be readily distinguishable, even in rapid speech. I take note here that in the often-cited case of *Mead Data Central, Inc. v. Toyota Motor Sales U.S.A., Inc.*, 875 F.2d 1026 (2d Cir. 1989), Toyota successfully argued that its mark "Lexus" was not substantially similar to plaintiff's "Lexis" trademark. In that case, Toyota hired a speech expert who testified that in

5

"ordinary, reasonably careful speech," the words "Lexis" and "Lexus" are pronounced differently. *Mead Data*, 875 F.2d at 1029-30. If "Lexis" is distinguishable from "Lexus," then surely "Lexxns" is much more so.

Also in defendants' favor is the fact that they have not copied the appearance of plaintiff's trademark or used its trade dress. Cf. *Ringling Bros. –Barnum & Bailey v. Celozzi-Ettelson Chevrolet, Inc.*, 855 F.2d 480, 482 (7th Cir. 1988) (auto dealer advertised "Greatest Used Car Show On Earth" with circus-style lettering); *Porsche Cars North America, Inc. v. Manny's Porshop*, Inc., 972 F. Supp. 1128 (N.D. Ill. 1997) ("the script in Manny's signs and advertisements is similar, if not identical to Porsche's script"); *Grey v. Campbell Soup Company*, 650 F. Supp. 1166 (C.D. Cal. 1986) (manufacturer of gourmet dog food "DOGIVA," used plaintiff GODIVA's distinctive gold foil ballotin trade dress). Neither the nightclub facade nor defendants' signs or post cards imitate the spaced-apart, slightly flattened, capital script which distinguishes plaintiff's mark. Nor do defendants' signs incorporate the Lexus symbol (a sort of "L" inside a circle). This factor weighs in defendants' favor.

### *(3) similarity of products*

Toyota sells luxury automobiles nationwide to anyone with the money to buy them and uses national media to do it. Mr. and Mrs. Rodriguez own a small nightclub on Chicago's northwest side primarily catering to a local Latino population. If I were asked to imagine an example of two products or services which were completely dissimilar, I could hardly do better than the ones before me in this case.

The total dissimilarity of the parties' products stands in contrast to many of the cases Toyota cites in its brief. See, e.g., *Eli Lilly & Co. v. Natural Answers, Inc.*, 2000 WL 1735075

6

*10 (7th Cir. 2000) (plaintiff's PROZAC and defendant's HERBROZAC are both substances taken to prevent depression); *Porsche Cars North America, Inc. v. Manny's Porshop*, Inc., 972 F. Supp. 1128 (N.D. Ill. 1997) (plaintiff and defendant both repaired Porsche automobiles); *Grey v. Campbell Soup Company*, 650 F. Supp. 1166 (C.D. Cal. 1986)(plaintiff GODIVA sold gourmet chocolates, while defendants DOGIVA sold "gourmet" dog biscuits).

Toyota suggests that because it uses the "Lexus" brand name on thermos bottles and drinking glasses which can hold alcoholic beverages, the Lexus branch of the Toyota Motor Company and the Lexxns nightclub are really similar products and services. This argument is strained at best. Lexus is not known to the public for its thermoses and glasses; it is known for its cars. It is unclear to me how "source" or "approval" confusion could result from the sale of collateral products such as drinking glasses. Incidentally, there is no suggestion that defendants use "Lexus" glasses at their club. This factor weighs heavily in defendants' favor.

### *(4) area and manner of concurrent use*

Toyota sells cars in the Chicago area. Defendants' nightclub is also in the Chicago area. Contrary to plaintiff's suggestion, the fact that both parties do business in Chicago is not an indication of likelihood of confusion. Confusion is likely to result when the parties' places of business are located near each other, or when products are sold at the same store or type of store. Moreover, in densely populated urban areas, the services must be quite close together before likelihood of confusion may occur. See, e.g., *Barbecue Marx, Inc. v. 551 Ogden, Inc.*, No. 00-3110 (7th Cir. November 22, 2000) (in densely populated downtown area, restaurants which are 1.4 miles apart do not necessarily cater to same customers). Lexxns Club is not next door to a Lexus dealership, or on the same block; it is well over a mile away.

Toyota would have me find that there is a material dispute of fact as to (1) how many people travel on Lincoln Avenue and (2) whether those who pass by or patronize Lexxns Club are familiar with the Lexus brand name. I do not agree. I am perfectly prepared to believe that some (even many) people who drive on Lincoln Avenue have heard of Lexus automobiles. But just because drivers and potential club patrons know about the Lexus brand name does not mean that they are likely to be confused about whether Lexxns Club is sponsored or endorsed by Toyota. This factor also weighs in favor of defendants.

### (5) *the degree of care exercised by consumers*

Lexus automobiles are marketed as luxury cars and sold to well-educated professionals. See *Mead Data Central, Inc. v. Toyota Motor Sales U.S.A., Inc.*, 875 F.2d 1026 (2d Cir. 1989). Toyota is quick to point out that since the *Mead Data* decision Lexus has developed an extensive market for second-hand Lexus automobiles which are sold to the general public, not just to well-educated professionals.

Whether or not plaintiff sells Lexus automobiles to well-educated professionals or other members of the public makes little difference because the parties' services are so remote in market proximity. See *Federal Express Corp. v. Federal Expresso, Inc.*, 1998 U.S. Dist. LEXIS 15607 *54 (N.D.N.Y. 1998)(there is less likelihood that even an unsophisticated consumer would become confused where the parties' markets are different). This factor is irrelevant to the likelihood of confusion determination.

8

*(6) actual confusion*

There is no evidence of actual confusion. Neither party has ever been contacted by a consumer who inquired about a connection between Lexus automobiles and Lexxns nightclub, or for that matter, showed up for dancing and drinks at a Lexus dealership or tried to buy a Lexus automobile from Gonzolo and Gloria Rodriguez.

*(7) defendants' intent*

Toyota charges defendants with intentionally identifying their nightclub in such a way that the public would see it as associated with Lexus automobiles. Toyota points to Gloria Rodriguez's admission that she chose the word "Lexxns" because it sounded "fancy," "pretty," and "expensive."

"Lexus" may have been one of the words in Mrs. Rodriguez's mind when she thought up the name of her new club. But mere awareness of the word "Lexus" does not prove an intent to unlawfully trade on the reputation and goodwill symbolized by plaintiff's mark. There are other reasons why the word "Lexxns" may have seemed to connote something "tasty, pretty, expensive, nice." The name is, as Mrs. Rodriguez testified, somehow phonetically pleasing. And there are other words beside "Lexus" whose connotations might make Lexxns an appropriate name for a nightclub (depending on which clientele one wants to attract): for example, vixens, Texans, sex, sin, nexus, legs, x-rated.

Moreover, as mentioned above, defendants' use of the name "Lexxns" is not accompanied by any deliberately confusing trade dress. Appearance and pronunciation of the word "Lexxns" alone is not enough to demonstrate predatory intent.

9

Complicating this case is Toyota's allegation that defendants were actually using the term "Lexxus" to refer to its bar. Toyota finds support in the fact that the club was formerly listed as "Lexxus" in the telephone book and with the Illinois Secretary of State. Toyota also proffers the testimony of a private investigator who would testify that a man who identified himself as the owner of defendants' club told him that the name of the club was pronounced "Lexus . . . like the car."

Defendants have an explanation. They say that their former attorney made a mistake in registering the club as "Lexxus," that Ameritech re-printed this error, that the club's name has always been spelled and pronounced "Lexxns," and that defendants took immediate steps to correct the mis-listings as soon as they discovered them. Defendants deny that Gonzalo Rodriguez ever told anyone that the name of his club was pronounced "Lexus." The fact that defendants' signs and facade are clearly spelled "Lexxns" supports defendants' contention that the "Lexxus" listings were unintentional. At this stage, however, I am to make no judgments as to credibility.

The question then becomes whether the purported previous use of the term "Lexxus" is enough to fend off summary judgment. I accept plaintiff's contention that the word "Lexxus" is, in visual appearance and pronunciation, a great deal more similar to plaintiff's mark than "Lexxns." It seems, however, that there is a mootness issue which neither party has addressed.

It is undisputed that even if defendants did, at one time, call their club "Lexxus," they do not do so now. The record contains proof of corrected listings in the Ameritech telephone book and with the Illinois Secretary of State. These corrections were made either before or shortly after plaintiffs brought suit in August 1999. In fact, defendants promptly agreed to correct the "Lexxus" listings as soon as it received Toyota's cease and desist letter. Since plaintiffs seek

10

injunctive relief rather than damages, the dispute about whether defendants used the name "Lexxus" is no longer material, and does not preclude the issuance of summary judgment.

### *(8) Summary of the likelihood of confusion analysis*

I am left with the fact that Toyota's mark is strong and somewhat similar to the word "Lexxns." This is not enough. It is clear from the record that Toyota seeks to promote Lexus as an upscale, luxury automobile. It seems unlikely that a company seeking to promote such an image would sponsor or endorse a small local nightclub catering predominately to Spanish-speaking residents of Chicago's northwest side absent evidence (and there is none) that analysis of the product shows that Toyota attracts a particularly large share of Spanish speaking Chicagoans to its Lexus models or even that it targets that group in its sales campaigns. The parties' products are so completely unrelated that no reasonable consumer would see Lexxns Club as being affiliated with Toyota. In general, summary judgment is not favored in trademark cases, but where no reasonable trier of fact could find a likelihood of confusion on the facts presented, summary judgment is appropriate. See *Meridian Mutual Ins. Co. v. Meridian Ins. Group, Inc.*, 128 F.3d 1111, 1115 (7th Cir. 1997).

### III. TRADEMARK DILUTION

Toyota's complaint further alleges that defendants' use of the name "Lexxns" blurs the distinctive qualities of its mark. The Federal Trademark Dilution Act, which became effective on January 16, 1996, amended Section 43 of the Lanham Act to provide a new cause of action for federal trademark dilution. Under the Act, the owner of a "famous mark" is protected against "another person's commercial use . . . of a mark or trade name, if such use begins after the mark

11

has become famous and causes dilution of the distinctive quality of the mark." See 15 U.S.C. § 1125(c)(1); *Syndicate Sales, Inc. v. Hampshire Paper Corp.*, 192 F.3d 633, 639 (7th Cir. 1999).

In this circuit, plaintiff need not show that the dilution of its trademark has caused economic harm; Toyota need only show a likelihood of dilution. See *Eli Lilly & Co. v. Natural Answers, Inc.*, 2000 WL 1735075 *10 (7th Cir. 2000). Cf. *Ringling Bros. v. Utah Division of Travel Development*, 170 F.3d 449 (4th Cir. 1999). In assessing the likelihood of dilution, I am to consider (1) the renown of the allegedly diluted mark and (2) the similarity of the marks at issue. See *Eli Lilly*, 2000 WL 1735075 *10. The degree of similarity required for a dilution claim is even greater than that which is required to show likelihood of confusion. *Id.*

Although plaintiff's mark is strong, I have already found that the parties' marks are not similar for purposes of the "likelihood of confusion" analysis. The fact that defendants did not copy plaintiff's distinctive trade dress, coupled with the visual and pronunciation differences between the marks distinguishes this case from nearly all of the cases plaintiff cites in support of its dilution argument. Toyota's dilution claim fails as a matter of law.

## IV. CONCLUSION

Defendants' motion for summary judgment is granted.

ENTER:

_____
James B. Zagel
United States District Judge

DATE: 8 Feb 2001

12